# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Alto Maipo Delaware LLC, *et al.*,[1]<br><br>                Reorganized Debtors. | Chapter 11<br><br>Case No.: 21-11507 (KBO)<br><br>(Jointly Administered) |
| Comunidad de Aguas Canal El Manzano on behalf of itself and its members and constituents, Gemma Contreras Bustamante, Christian Becker Matkovic, Maite Birke Abaroa, Bruno Bercic,<br><br>                Plaintiffs,<br><br>-against-<br><br>Alto Maipo SpA,<br>                Defendant. | Adv. Pro. No.: 22-50381 |

## DECLARATION OF SEBASTIÁN AVILÉS PURSUANT TO RULE 44.1 IN SUPPORT OF ALTO MAIPO'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

I, Sebastián Avilés, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a partner in the law firm of Moreno Sáez & Avilés Abogados ("MSyA", or the "Firm"), which position I have held since 2017. The Firm maintains an office at Isidora Goyenechea 3477, piso 14, Las Condes, Santiago, Chile. I joined the firm as a founder in 2017, and I have been admitted to practice law in Chile since 2010.

---

[1] The Reorganized Debtors in the now-concluded Chapter 11 Cases, along with the last four digits of each Reorganized Debtor's tax identification number in the jurisdiction in which it operates, are: Alto Maipo SpA (761-2) (Chile) and Alto Maipo Delaware LLC (1916) (Delaware). The location of the corporate headquarters and the service address for Alto Maipo SpA is Los Conquistadores 1730, Piso 10, Santiago, Chile.

2. I submit this declaration (the "Declaration") in support of the motion (the "Motion")[2] of Alto Maipo seeking to dismiss the Complaint and Administrative Expense Claims filed against Alto Maipo in the Bankruptcy Court by the Plaintiffs. MSyA has been retained by Alto Maipo in connection with similar claims brought by the Plaintiffs in Chile.

3. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, information provided to me by Alto Maipo's employees or advisors, my review of relevant documents or my opinion, based upon my experience and knowledge of relevant Chilean law. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

**A. The Nature of Manzano's Water Rights**

4. Manzano is an agricultural association that has the right to use and consume water from the Colorado River for agricultural and similar economic purposes. Based upon my review of the relevant licenses and concessions that are public records in Chile, Manzano lacks the necessary licenses, concessions and/or permits to provide water for human consumption.

5. Manzano's water consumption right entitles it to take 400 liters of water per second from the Colorado River. During the month of January 2022, Manzano's water consumption right was subject to an emergency water scarcity decree by the Dirección General de Aguas ("DGA") that resulted in daily limitations on Manzano's authorized water use.

6. Moreover, according to articles 22 and 163 of the Chile Water Code, prior to granting any entity a water right, the DGA reviews the water rights of third parties downstream. The same review process is also required to move the catchment point affecting a water right. The

---

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to them in the Motion.

2

DGA will not grant a new water right, or allow the movement of the catchment point, if the exercise of the right would trump any other existing right. This check, and the attendant calculations, are memorialized in the technical analysis performed by the DGA prior to granting a new water right or the movement of a catchment point. This technical analysis is precisely what happened before the DGA granted water rights to Alto Maipo, as well as the movement to the current catchment point —the DGA confirmed that the exercise of Alto Maipo's water rights would never trump the water rights of third parties downstream, including Manzano.

7. Further, water used for human consumption is subject to special regulations in Chile. The DFL 382/1988, General Sanitary Services Law, the DFL 725/1967, Sanitary Code, and Law N° 20.998, Rural Sanitary Services (the "Sanitary Law") regulates the use of water for human consumption, while article 56 of the Water Code regulates the use of groundwater for drinking and domestic use. In order to use water for human consumption without committing a regulatory infraction, Manzano would have apply for, and be granted, the mandatory licenses, concessions and/or permits under these laws.

8. On June 10, 2021, Manzano and Alto Maipo entered into that certain Manzano Contract pertaining to the construction of certain complementary water intake works. Manzano asserts that Alto Maipo is obligated to construct the Manzano Intake within six months following: (1) the date the Project begins operational; and (2) upon receipt of a permit from the DGA allowing the Project to operate commercially. In the Complaint, Manzano asserts that Alto Maipo violated this contract term. This exact claim has been the subject of several disputes before various Chilean tribunals and agencies, none of which have been resolved in Manzano's favor.

9. Importantly, under the Manzano Contract, the parties irrevocably agreed to an arbitration clause, stating "[any] difficulty or controversy that may arise between the Parties" shall

be brought before the Santiago Chamber of Commerce A.G., which includes the breach of contract and related claims asserted under the Complaint:

> **TWENTY-THIRD: Domicile and Arbitration**. […]. Any difficulty or controversy that may arise between the Parties with respect to the application, interpretation, duration, validity or execution of this Agreement or any other reason shall be brought to the attention of the Parties so that the differences may be analyzed and resolved at the work table. In the event that no solution to the discrepancies is reached at the work table within sixty calendar days, such discrepancies shall be submitted to arbitration, in accordance with the Arbitration Procedural Rules of the Arbitration and Mediation Center of Santiago, in force at the time of the request. The Parties grant special irrevocable power of attorney to the Santiago Chamber of Commerce A.G., so that, at the written request of any of them, it may appoint an arbitrator at law from among the members of the arbitration body of the Santiago Arbitration and Mediation Center.

10.     At no point has Manzano undertaken steps to initiate an arbitration proceeding.

**B. Plaintiffs' Action Before the Second Environmental Court of Santiago**

11.     Over the past several years, various individuals, including Plaintiffs Contreras and Birke, have asserted claims that their water rights were negatively affected by Alto Maipo's construction of tunnels in connection with the Project. Their claims were rejected by the Republic of Chile, Second Environmental Court of Santiago (the "Environmental Court") on November 3, 2021, following a full and fair judicial process in accordance with Chilean law.[3] The Environmental Court is a three-member tribunal, comprised of one engineer and two lawyers. It issued its 340-page ruling after considering extensive evidence, including various expert reports submitted by parties, including Plaintiff Birke.

---

[3] The proceedings were held by the Environmental Court under the jurisdiction and competencies established in numeral 3) of Article 17 of Law No. 20,600 that creates the Environmental Court. In addition, the process was carried out in accordance with the common and special provisions established for claims in Title III of the aforementioned law, guaranteeing due process.

12. The Environmental Court Ruling addressed various claims filed by Maite Birke Abaroa, Citizens Coordinator of an organization called "No Alto Maipo," and a group of members of the "No Alto Maipo" group, respectively, challenging the Exempt Resolution No. 29/Rol D-001-2017 issued by the Superintendency, which approved the Compliance Program submitted by Alto Maipo. The Compliance Program addressed the fourteen charges of non-compliance with the Environmental Qualification Resolution No. 256/2009 ("RCA 256/2009"), which approved the construction of the Project.[4] The following charge related to the water generated during the construction of the tunnels.

> Charge 14. *"The authority was not immediately informed, nor were the necessary actions taken to control and mitigate the unforeseen environmental impacts associated with the volumes of water generated during the construction of the tunnels, in particular in the VA4, V1, V5, VA1, VL4, VL5, VL7-VL8 and Ll sectors,"* which infringed recital 12 of RCA No. 256/2009. This breach was classified as serious in accordance with item e) number 2 of Article 36 of the LOSMA.[5]

13. The Environmental Court dismissed all allegations related to Charge 14 on the basis that Alto Maipo's Compliance Program satisfactorily addressed the breaches listed in Charge 14. The Environmental Court found that Alto Maipo's Compliance Program properly controlled the inflow of water into the Project and managed the treatment and discharge from the tunnels.[6]

14. First, the Environmental Court held that the technical studies filed by Alto Maipo demonstrated that the water found in the tunnels did not have the same origins as the water that flows in the rivers.[7] Rather, the water found in the tunnels came from local precipitations in lower

---

[4] Environmental Court Ruling pp. 3-7.

[5] *Id.* p. 7.

[6] *Id.* p. 253-54.

[7] *Id.* p. 240-41 ("[I]n the Court's opinion, the negative effects on the amount of surface water resources, generated by the inflows of water due to the construction of the tunnels, have been correctly ruled out, by virtue of the findings contained in the 'Study of Origin of PHAM Tunnel Waters' prepared by SRK Consulting, of June 2017, which was presented in Annex 14 of the [Compliance Program].").

5

height, which was naturally infiltrated from the mountain slopes throughout the geological structures with greater levels of fracturing or contacts linked to volcanic events.[8] Thus, there was no basis to conclude that the quantity of water in the rivers was affected by the construction of the tunnels.[9] In short, the water in the tunnels did not come from the rivers in which the individuals held water rights; it came from an entirely different source—local precipitation infiltrated through geologic structures.

15.     Second, the Environmental Court rejected similar arguments that the construction of the tunnels affected the underground water rights of third parties in the El Manzano sector.[10] The Environmental Court concluded that there was a hydrological disconnection between the wells where the water rights were held and the waters flowing through the tunnels.[11] Accordingly, it was hydro-geologically not feasible for the water in the tunnels to affect the underground water rights of third parties in the El Manzano sector.[12]

16.     Following the Environmental Court Ruling, the Environmental Assessment Commission in Chile ratified the aforementioned conclusions in the review process of the

---

[8]     *Id.* p. 241 ("[T]he study indicates that the inflow waters in the . . . tunnels do not have the same origin as the waters flowing through the rivers, since their recharge comes from local precipitations of lower altitudes, which has infiltrated from the slopes through geological structures with higher levels of fracture or contacts between volcanic events.").

[9]     *Id.* ("[C]onsidering the conclusions of the isotope layout of the waters, the Court finds that there is no history to show that the quantity of the water component in the basins of the aforementioned rivers was affected.").

[10]    *Id.* p. 242.

[11]    *Id.* p. 242 ("[A]n impact [on] the rights of use of groundwater of third parties constituted in the El Manzano Sector is ruled out, on the basis that the conclusions of the study 'Final Report Radius of influence produced by the drainage of the Las Lajas tunnel in sector Ll,' prepared by Hidromas Ltda., and submitted in Annex 14 of the [Compliance Program], permit a hydrological disconnection to be confirmed between wells with rights to use waters constituted in the Manzano sector and the inflow waters flowing through the tunnels of the project.").

[12]    *Id.* ("[I]t is important to note that the wells with constituted rights extract water directly from the sedimentary fill of the Maipo River, and due to the low permeability of the rock system in which the Las Lajas tunnel is located, hydrogeologically it is not feasible that the effect of the drainage of the tunnel propagates to the sedimentary fill. Finally, the rest of the wells with rights to use groundwater constituted in the area are at a distance of kilometers from the tunnel axis, so any possible impact caused by the Las Lajas tunnel on the wells with constituted water use rights is ruled out.").

environmental license, and incorporated certain proposed additional measures that were being executed by Alto Maipo to address the water in the tunnels.

17. The review procedure conducted by the Environmental Assessment Commission fully complied with the due process requirements set forth in the second paragraph of Article 25 quinquies of Law No. 19,300. Specifically, (i) there were two public information processes, an announcement was published in the Official Gazette and a newspaper of national circulation, and citizens were granted ten working days to file any observation, (ii) the competent sectoral (state, regional, or local) authorities, including the Chilean water authority (DGA), the Chilean mining authority (Servicio Nacional de Geología y Minería), and the Chilean fishing service (Subsecretaría de Pesca y Acuicultura), were notified for the issuance of technical reports, and (iii) the titleholder of the Project had a prior hearing so that he could present what he deemed pertinent.

18. To summarize, the Environmental Court found, and the Environmental Assessment Commission agreed, that there is no basis for the assertions made by Plaintiffs, similar to those in the present Complaint, that (i) the tunnels constructed by Alto Maipo diverted any water from rivers or (ii) that the tunnels constructed by Alto Maipo affected the underground water rights owned by third parties in the El Manzano sector. Thus, based on the Environmental Court's ruling and consistent with Chilean law, no party has any basis to assert any liability against Alto Maipo related to the construction of the tunnels.

**C. Manzano's Request for Injunctive Relief in Chile**

19. In March 2022, Manzano initiated the Manzano Action in the Chilean Court of Appeals of San Miguel. At the outset of the Manzano Action, Manzano filed the Injunction Motion. In the Injunction Motion, Manzano alleged that Alto Maipo's operation of the Project, including certain testing and commissioning of the Project on or around February 25, 2022,

violated the water rights of Manzano's individual members under Chilean constitutional law. The Injunction Motion requested that the Chilean Court (i) declare a violation of the Manzano community's property rights; (ii) order Alto Maipo to immediately halt any testing, commissioning, or operation of the Project and/or Hydroelectric Plants; (iii) order that Alto Maipo abstain from taking any future actions that could impact Manzano's water rights; and (iv) grant related injunctive relief.

20. In support of its allegations in the Manzano Action, Manzano presented no evidence aside from photographs of the Colorado River. In support of its defense, Alto Maipo presented data showing that Manzano's water intake level never fell below Manzano's authorized use amount to the satisfaction of the Chilean Court, evidence that was not, and could not have been, rebutted by Manzano in that proceeding.

21. On March 29, 2022, the Chilean Court of Appeals of San Miguel entered an order denying all of Manzano's requested injunctive relief under the Injunction Motion.

22. Following the decision on the request for injunctive relief in the Injunction Motion, Alto Maipo submitted its defense requesting the rejection of the Manzano Action due to severe defects in both substantial and procedural matters. The Chilean Court held oral arguments on the merits of the underlying claims on April 19, 2022.

23. On June 10, 2022, the Chilean Court denied Manzano's request, finding that the relief sought by Manzano: (i) exceeded the jurisdiction of the Chilean Court to provide urgent relief and was, therefore, impermissible, and (ii) was already subject of an investigation before the Superintendency.

24. Based on the Chilean courts' rulings and consistent with Chilean law, I believe that Manzano does not have any basis to assert liability against Alto Maipo related to the operation of

the Project because Alto Maipo has fully complied with Chilean law, including by taking actions to ensure that Manzano could take water from the Colorado River in accordance with its property rights. Further, as agreed in the Manzano Contract, the proper forum for adjudication of Manzano's claims is an arbitration proceeding before the Santiago Chamber of Commerce.

### D. Manzano Petitions to the Superintendency and the Chilean Electric Coordinator

25.     In April 2022, Manzano submitted additional claims (the "Manzano Petition") before the Chilean Superintendency of Environment (the "Superintendency"), as well as the Manzano Petition to the Chilean National Electrical Coordinator (the "Electric Coordinator"). The Superintendency has authority to take action to remedy violations of environmental regulations when it believes such action is warranted. In the instant case, the Superintendency did not take any direct action in response to the additional Manzano claims, but rather requested information from Alto Maipo and sent a short letter to the Electric Coordinator relaying Manzano's allegation that the complementary water intake works had not been executed yet.

26.     Alto Maipo responded to Manzano's additional claims and the short letter by sending a response letter to the Superintendency (the "Response Letter"). In the Response Letter, Alto Maipo explained that the they were not operating the Project in breach of environmental obligations.

27.     Also, without responding to the short letter from the Superintendency, and without taking any remedial action in response to the Manzano Petition, the Electric Coordinator proceeded to grant subsequent commercial operating certificates, allowing Alto Maipo to begin full commercial operation of the Project. This necessarily indicates that the Electric Coordinator did not find any merit to the allegations in the Manzano Petition as it related to approving the commercial operation of the Project.

28. In late April 2022, the Superintendency issued a temporary 30-day decree to address the Manzano Petition requesting monitoring of the Colorado River. All results demonstrated that Manzano had enough water to satisfy their water rights. Following the lapse of that 30-day period, the Superintendency has taken no further actions.

### E. Under Chilean Law, Only the DGA and the Superintendency May Investigate, and Recover Fines for, Violations of the Water Code and Environmental Law.

29. The Plaintiffs do not have standing to assert private actions based on violations of the Chile Water Code or environmental law. According to Chilean law, any violations of the Chile Water Code or environmental law must be the subject of a sanctioning procedure before the DGA or the Superintendency. The decisions of these agencies are subject to review by Chilean judiciary. The only cause of action available to private individuals is a constitutional challenge to the DGA or Superintendency's decision not to pursue an investigation. As such, claims such as those contained in the Complaint may only be brought by the DGA and the Superintendency, and not by private citizens or groups such as the Plaintiffs, as discussed below.

    i.    **The Dirección General de Aguas**

30. The DGA has all supervisory and sanctioning powers with respect to violations of the Chile Water Code. The sanctioning procedure for Water Code violations is regulated in Articles 172 bis. The DGA is the competent entity in charge of these procedures. A sanctioning procedure can be initiated in four different ways: (i) by the DGA itself; (ii) by a complaint to the DGA from an individual; (iii) by admission of violation by a wrongdoer; or (iv) at the request of another State Department. Regardless of how the sanctioning procedure is initiated, the DGA is the sole entity authorized to prosecute such claims.

31. Pursuant to article 173 of the Chile Water Code, if the DGA determines that there has been a Water Code violation after implementing a sanctioning procedure, the DGA may assess

certain fines depending on the severity of the violation, all of which inure to the benefit of the Chilean Republic through the General Treasury of the Republic—not to individual complainants.

    **ii.**    **The Environmental Superintendency**

33.    The Superintendency is charged with overseeing compliance with environmental law in Chile. As set forth in the Organic Law of the Superintendency, established in Article 2 of Law No. 20.417, article 35, the Superintendency is empowered and obligated to investigate and sanction violations of environmental law, including, among other things, potential non-compliance with Resolutions of Environmental Qualification (*Resoluciones de Califaction Amiental,* or "RCAs"), emission and quality provisions, prevention and decontamination plans, and all environmental instruments authorized by law.

33.    Pursuant to article 47 of the Organic Law of the Superintendency, a sanctioning procedure for violation of environmental law may be initiated: (i) *ex officio*, when the Superintendency becomes aware of facts that could constitute an infraction; (ii) at the request of any sectoral body, when it becomes aware from the reports issued by the agencies and services with competence in matters of environmental audits; or (iii) following the filing of a complaint that meets the requirements of seriousness and merit established by law.

34.    Pursuant to article 38 of the Organic Law of the Superintendency, if the Superintendency determines that a violation of environmental law has occurred, it may issue the following types of sanctions depending on the severity of the violation: (i) written reprimand (only for minor infractions); (ii) a monetary fine that will increase depending on severity of the infraction; (iii) closing the project (only for serious and very serious infractions); and (iv) revocation of an RCA (only for serious and very serious infractions). If a monetary fine is assessed, it will be paid to

the General Treasury of the Republic—not to any individual affected party.  Individuals do not have standing to recover damages for violations of environmental law in Chile.

35. For the reasons set forth above, claims under the Complaint asserting violations of the Chile Water Code or Chilean environmental law are not cognizable under Chilean law insofar as they are brought by private plaintiffs.  Under Chilean law, Plaintiffs do not have standing to assert, or recover damages for, such claims.  Rather, the investigation and sanctioning authority for such claims rests solely in the DGA and the Superintendency, which entities will continue to have the authority to investigate and sanction any violations of the Water Code or environmental law to the extent any violations ever occur.

**F. Plaintiff's Contractual Claims May Be Brought in Chile**

36. While Alto Maipo disputes Plaintiffs' allegations that Alto Maipo breached the terms of the Manzano Contract, Plaintiffs are free to bring their contractual damage claims in an arbitration proceeding before the Santiago Chamber of Commerce.  Plaintiffs' contractual damage claims stem from the Manzano Contract, which is governed by Chilean law and has already been the subject of several disputes initiated by Plaintiffs in courts of competent jurisdiction in Chile (as discussed herein).  Therefore, the Santiago Chamber of Commerce, the Chilean tribunals and administrative agencies are best suited to hear the contractual damage claims alleged by Plaintiffs.  Importantly, several tribunals and agencies have already weighed in on the merits of Plaintiffs' allegations and their decisions should not be undermined by Plaintiffs' efforts to bring these claims in a different forum in the hopes of a better result.

37. Further to the point, all parties subject to the Complaint are Chilean nationals, and disputes arising under the Manzano Contract solely revolve around rights under Chilean law.

Relatedly, the relevant documents, witnesses and physical evidence necessary to support and defend against these claims are all located in Chile.

38. Additionally, to the extent the Complaint centers around the alleged eight non-consecutive days without water, the Manzano Contract provides for liquidated damages to remedy any such occurrence and such liquidated damages are valid and enforceable under Chilean law.

39. In conclusion, as a matter of Chilean law, Alto Maipo has no liability to the Plaintiffs. In summary, (i) Manzano's water rights have not been affected by the Project, as demonstrated by the Environmental Court Ruling and the undisputed facts; (ii) the Plaintiffs do not have standing to assert claims against Alto Maipo for alleged non-contractual violation of the Water Code or environmental law because such claims my only be brought by the DGA and the Superintendency; and (iii) the Chilean tribunals are available to hear the Plaintiffs' damage claims under the Manzano Contract, as they have time and again.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  July 27, 2022         ALTO MAIPO SPA
        Santiago, Chile

                              *Sebastián Avilés*
                              Sebastián Avilés
                              Partner, Moreno Sáez & Avilés Abogados